DECLARATION OF CRYSTAL L. JOHNSON
SPECIAL AGENT, OFFICE OF INSPECTOR GENERAL

I, Crystal L. Johnson, make the following sworn declaration:

1. I am a Special Agent in the Investigations Operations Division of the Office of the Inspector General, General Services Administration (GSA). As a Special Agent, I have been assigned the responsibility of conducting an investigation by the OIG relating to the Federal Supply Schedule (FSS) contracts of Capitol Supply, Inc.

2. This declaration is submitted in support of the United States' Petition for Summary Enforcement of two Inspector General subpoenas issued to Capitol Supply, Inc. (Capitol), and is based on personal knowledge obtained by me in the course of my official duties.

3. The subpoena seeks records that would enable the Office of Inspector General to determine, in part, (1) whether Capitol has made false claims and/or false statements relating to the negotiations and performance of the relevant contracts, and (2) whether Capitol supplied government purchasers through its FSS contracts with items that were products of non-designated countries, in violation of the Trade Agreements Act, its implementing regulations, and the requirements of Capitol's FSS contract.

4. The Office of Inspector General (OIG) has the following statutory duties and responsibilities regarding the programs and operations of the General Services Administration:

   a. The OIG must prevent and detect fraud, waste, and abuse in the GSA's programs and operations. 5 U.S.C. App. 3 § 2(2).

   b. The OIG must help identify and prosecute those participating in defrauding GSA programs. 5 U.S.C. App. 3 § 4(a)(4)(B).

   c. The OIG must report to the Attorney General any possible violation of Federal criminal law that the OIG has discovered.  5 U.S.C. App. 3 § 4(d).

  5. In order to carry out its statutory duties and responsibilities, Congress has given broad subpoena power to the OIG:

> In addition to the authority otherwise provided by this Act, each Inspector General, in carrying out the provisions of this Act, is authorized . . . to require by subpoena the production of all information, documents, reports, answers, records, accounts, papers, and other data in any medium (including electronically stored information, as well as any tangible thing) and documentary evidence necessary in the performance of the functions assigned by this Act, which subpoena, in the case of contumacy or refusal to obey, shall be enforceable by order of an appropriate United States district court . . . .

5 U.S.C. App. 3 § 6(a)(4).

  6. Among the "programs and operations" of the General Services Administration over which the OIG has audit and investigatory responsibility is the GSA's Federal Acquisition Service (FAS).  In this respect, the Office of Inspector General has the duty and responsibility under the Inspector General Act to root out fraud, waste, and abuse in, and to ensure the integrity of, FAS's contracts under the Federal Supply Schedule and orders placed through them.  In cases where its investigation reveals fraud, waste, or abuse, the Office of Inspector General has the responsibility to recommend appropriate action, including criminal, civil, and administrative remedies.

  7. Capitol Supply, Inc., has been awarded numerous FSS contracts by GSA, including, it appears, some that were awarded to the same entity operating under a different business name.  Capitol holds the following contracts current FSS contracts: GS-02F-0100N (office products); GS-30F-0019U (automotive superstore); GS-21F-0001K (hardware and appliances); GS-06F-0070R (hardware and appliances); and GS-27F-0028P (furniture).

  8. On June 29, 2010, relator Louis Scutellaro filed a qui tam complaint (under seal) with the United States District Court for the District of Columbia, alleging that Capitol was

"selling products to the United States Government that did not originate in designated countries under the Trade Agreements Act, and therefore . . . presenting false claims to the United States Government for payment."  Specifically, the complaint alleged that Capitol "falsely claimed that Fellowes Manufacturing Company's paper shredders," which were offered for sale through Capitol's FSS contracts, "were made in the United States, whereas, in truth and in fact, they were manufactured in China."  The complaint further alleged that Capitol "falsely market[s] numerous other products" through FSS contracts "as being manufactured in the United States when they are not, including, but not limited to: light bulbs (incandescent, fluorescent, halogen, sodium, etc.), light fixtures (indoor and outdoor), thermostats, televisions, computer monitors, computer back up power supplies, electric heaters, exhaust fans, batteries, ballasts for fluorescent fixtures, vacuum cleaners, clocks and timers.  Most, if not all, of the products are made in China or Mexico."

      a.    <u>Statutory and Regulatory Requirements</u>.  The Buy American Act (BAA), 41 U.S.C. §§ 8301 – 8305, requires that with certain stated exceptions, "[o]nly unmanufactured articles, materials, and supplies that have been mined or produced in the United States, and only manufactured articles, materials, and supplies that have been manufactured in the United States substantially all from articles, materials, or supplies mined, produced, or manufactured in the United States, shall be acquired" by a federal agency.  41 U.S.C. § 8302(a)(1).  The Trade Agreements Act (TAA), 19 U.S.C. §§ 2501 – 2581, provides that "the President may waive" the requirements of the Buy American Act "with respect to eligible products of any foreign country or instrumentality designated under subsection (b) of this section" such that the products of that country will be afforded treatment as favorable as that afforded "to United States products and suppliers of such products."  19 U.S.C. § 2511(a).  Designated countries fall into several categories, including those countries which are parties to the World Trade Organization Agreement on Government Procurement (WTO GPA) or the North American Free Trade

Agreement and "provide appropriate reciprocal competitive government procurement opportunities to United States products and suppliers of such products." *Id.* §§ 2511(b)(1), 2518(1). A complete list of designated countries is provided at 48 C.F.R. § 25.003; the list includes Mexico, but does not include China. Thus, with respect to China (and other non-designated countries), there is no authorization to waive the BAA. Unless an exception applies, federal agencies may not purchase the products of non-designated countries. The authority to waive BAA requirements has been invoked for procurements in excess of the so-called TAA threshold, which varies depending on the trade agreement involved; for the WTO GPA, the largest trade agreement, the threshold is currently $202,000 for purchases of products.[1]  48 C.F.R. § 25.402. The Federal Acquisition Regulation prescribes standard federal contract clauses implementing these requirements. 48 C.F.R. § 52.225-5(b) provides, "The Contractor shall deliver under this contract only U.S.-made or designated country end products except to the extent that, in its offer, it specified delivery of other end products in the provision entitled 'Trade Agreements Certificate.'" The "Trade Agreements Certificate" clause appears at 48 C.F.R. § 52.225-6. That clause provides (among other things), "The offeror shall list as other end products those supplies that are not U.S.-made or designated country end products." In Capitol's contract GS-02F-0100N, for example, the clause at 52.225-5 is incorporated by reference on page 69 of the solicitation, and the trade agreements certification appears on pages 90-91. The accompanying list of "end products that are not U.S.-made, [or from a] designated country" is empty, indicating that the contract does not permit the sale of any products of non-designated countries.

    b.  <u>False Claims</u>. The Trade Agreements Certificate in Capitol's contracts also contains the following language: "The offeror certifies that each end product, except those

---

[1] Whether the threshold is crossed "is determined from the estimated value of the acquisition." *Tic-La-Dex Bus. Sys.*, B-235016, 1989 WL 241225, at *5 (Comp. Gen. Oct. 6, 1989). "Since the estimated dollar value of each Schedule exceeds the established Trade Agreements Act (TAA) threshold, the TAA is applicable to all Schedules." GSA, Ordering Guidelines, *at* www.gsa.gov/schedules-ordering.

listed in paragraph (b) of this provision, is a U.S.-made or designated country end product . . . ." *Id.* § 52.225-6(a). Submitting claims for payment for products sold through the FSS contract that do not conform to this certification may constitute criminal false statements or civil false claims, in violation of 18 U.S.C. §§ 1001, 287, or 31 U.S.C. §§ 3729 *et seq.*, respectively.

9. The Office of Inspector General initiated its investigation of Capitol after receiving the qui tam complaint.

10. On November 5, 2010, the Deputy Inspector General, on behalf of the Inspector General, signed and issued Subpoena No. 1732 for records to Capitol Supply, Inc. On the same date, the subpoena was served on Capitol by certified mail. A true copy of the subpoena and the signed certificate of service are attached as Exhibit 1. The subpoena seeks seven categories of documents relating to the above-listed FSS contracts between Capitol and GSA: (1) sales data (including country of origin information) for sales of Fellowes-brand shredders; (2) correspondence pertaining to the country of origin of Fellowes-brand shredders sold through Capitol's FSS contracts; (3) documents pertaining to the manufacture or assembly location of Fellowes-brand shredders sold through Capitol's FSS contracts; (4) other documents pertaining to the country of origin of Fellowes-brand shredders sold through Capitol's FSS contracts; (5) documents relating to the deletion of Fellowes-brand shredders sold through Capitol's FSS contracts due to the shredders' country of origin; (6) documents Capitol received from its suppliers relating to Fellowes-brand shredders sold through Capitol's FSS contracts; and (7) the names, positions, addresses, and titles of current and former Capitol employees associated with sales of Fellowes-brand shredders under Capitol's FSS contracts. These seven categories of documents are relevant for the following reasons:

    a. <u>Sales Data</u>. The OIG must review this material to determine whether Capitol sold TAA non-compliant Fellowes shredders through its FSS contracts, and if so, which shredders were involved and what the sales volume was.

b. <u>Correspondence</u>. The OIG must review this material to determine whether it contains additional or contradictory information regarding TAA non-compliant sales under Capitol's FSS contracts, and whether Capitol was aware of this non-compliance. Any correspondence to this effect might indicate intent to defraud the Government.

c. <u>Manufacture or Assembly Location</u>. The OIG must review this material to verify the country of origin of shredders sold under Capitol's FSS contract, including whether any such shredders may have been substantially transformed in a TAA-designated country after initial production in a non-designated country. (Products which have been substantially transformed in a designated country are considered compliant with TAA. 48 C.F.R. § 25.001(c)(2).)

d. <u>Other Documents Regarding Country of Origin</u>. As with the correspondence, the OIG must review this material to determine whether it contains additional or contradictory information regarding TAA non-compliant sales under Capitol's FSS contracts, and whether Capitol was aware of this non-compliance. Such material could also indicate intent to defraud the Government.

e. <u>Deletion of Shredders</u>. The OIG must review this material in order to determine whether Capitol was aware of its obligations connected to the TAA; whether it was aware that any shredders offered under its contract were TAA non-compliant; and whether it made efforts to comply with its contractual and legal obligations. Such material could likewise indicate intent to defraud the Government.

f. <u>Documents from Suppliers</u>. The OIG must review this material in order to verify the country of origin of shredders sold through Capitol's FSS contracts, Capitol's awareness of the country of origin of these products, and whether Capitol kept required records relating to country of origin.

g. <u>Contact Information</u>. The OIG must obtain this information in order to

interview Capitol employees who can verify Capitol's knowledge of its contractual obligations and of the country of origin of products sold under its contracts.

11. The subpoena required Capitol to produce the documents by November 19, 2010. I spoke with Holly Roth, an attorney with Manatt, Phelps, and Phillips, LLP, on November 15, 2010. We agreed that Capitol would produce responsive documents in a "rolling" fashion, as described in Ms. Roth's email of November 15, 2010, which is attached as Exhibit 2. Ultimately, Capitol produced sales information for Fellowes shredders for the time period 2004 to mid-December 2010. It appears, however, that this data pertained only to sales under contract GS-02F-0100N, though the subpoena called for material relating to Fellowes shredders sold through all of Capitol's contracts. Moreover, for 36 of the 46 Fellowes shredder models offered through Capitol's FSS contracts, Capitol did not provide documentation regarding country of origin.

12. On June 22, 2011, the Deputy Inspector General, on behalf of the Inspector General, signed and issued Subpoena No. 1774 for records to Capitol Supply, Inc. On the same date, the subpoena was served on Capitol by certified mail. A true copy of the subpoena and the signed certificate of service are attached as Exhibit 3. The subpoena seeks seven categories of documents relating to Capitol's FSS contract number GS-02F-0100N: (1) sales data (including country of origin information) for all products sold under the contract; (2) documents pertaining to the manufacture or assembly location of products sold through the contract; (3) documents Capitol received from its suppliers relating to the country of origin of products sold through the contract; (4) other documents pertaining to the country of origin of products sold through the contract; (5) documents relating to Capitol's efforts to comply with the TAA; (6) documents relating to the deletion of products from the contract due to their country of origin; and (7) the names, positions, addresses, and titles of current and former Capitol employees associated with Capitol's performance of the contract. These seven categories of documents are relevant for the

following reasons:

      a.    <u>Sales Data</u>.  The OIG must review this material to determine whether Capitol sold TAA non-compliant products through contract number GS-02F-0100N, and if so, which products were involved and what the sales volume was.

      b.    <u>Manufacture or Assembly Location</u>.  The OIG must review this material to verify the country of origin of products sold through the contract, including whether any such products may have been substantially transformed in a TAA-designated country after initial production in a non-designated country.

      c.    <u>Documents from Suppliers</u>.  The OIG must review this material in order to verify the country of origin of produdcts sold through the contract, Capitol's awareness of the country of origin of these products, and whether Capitol kept required records relating to country of origin.

      d.    <u>Other Documents Regarding Country of Origin</u>.  As with the documents from suppliers, the OIG must review this material to determine whether it contains additional or contradictory information regarding TAA non-compliant sales under Capitol's FSS contracts, and whether Capitol was aware of this non-compliance.  Such material could also indicate intent to defraud the Government.

      e.    <u>Compliance Efforts</u>.  The OIG must review this material in order to determine whether Capitol was aware of its obligations connected to the TAA and what, if any, efforts it made to comply with those obligations.  Such material could also indicate intent to defraud the Government.

      f.    <u>Deletion of Shredders</u>.  The OIG must review this material in order to determine whether Capitol was aware of its obligations connected to the TAA; whether it was aware that any shredders offered under its contract were TAA non-compliant; and whether it made efforts to comply with its contractual and legal obligations.  Such material could likewise

to defraud the Government.

        g.    <u>Contact Information</u>. The OIG must obtain this information in order to interview Capitol employees who can verify Capitol's knowledge of its contractual obligations and of the country of origin of products sold under its contracts.

    13.    The subpoena required Capitol to produce the documents by July 22, 2011. Capitol made two productions in July of 2011. The first, which included Bates Stamp numbers 1-22208, was provided on an unreadable compact disc. The second, which included Bates Stamp numbers 22209-773448, constituted 53,181 pages of sales invoices in PDF format, covering the period from August 2010 through April 2011. The subpoena called for documents pertaining to the period January 1, 2004 through June 21, 2011. Moreover, the subpoena requested documents in Excel or a comparable format. While Capitol was not required to create documents in order to comply with the subpoena, it was required to produce all relevant documents in its possession. If Capitol maintains its sales information in a database, it must produce the database. The subpoena thus offered an Excel-type format as an alternative to producing an entire database. Unless Capitol has no system other than paper invoice copies for tracking its sales, its production was not compliant with the subpoena. In September of 2011, Capitol made a further production, including Bates Stamp numbers 73449-1563209. This production contained 1,489,760 pages of data feeds from Capitol's various suppliers. The feeds were originally in .xml format and Capitol converted them to PDF format. It appears Capitol then imported the material into software called "TrueCrypt." As a result, this material was unreadable; once opened, individual files contained a jumble of letters, numbers, and symbols. A sample of this material is attached as Exhibit 4.

    14.    After several months of discussions attempting to sort out the problems with the material Capitol provided, on April 3, 2012, I sent an email to Capitol's outside counsel, in which I explained, "I still have several questions . . . . I would like to visit the Capitol Supply

facility and meet with the owner on April 24, 2012 to discuss" the production in response to both subpoenas, and the fact that the sales data Capitol produced in response to the first subpoena reflected that 15% of sales were attributable to TAA non-compliant items.

15.   I received a letter in response dated April 10, 2012, from Ms. Roth. The letter asserted, among other things, that Capitol's software system maintains country of origin information "in real time when Capitol accepts and fulfills an order," but does not preserve this information as regards past sales. The "Examination of Records by GSA" clause at 48 C.F.R. § 552.215-70 states that "[t]he Contractor agrees that the Administrator of General Services or any duly authorized representatives shall, until the expiration of 3 years after final payment under this contract, or of the time periods for the particular records specified in Subpart 4.7 of the Federal Acquisition Regulation (48 CFR 4.7), whichever expires earlier, have access to and the right to examine any books, documents, papers, and records of the Contractor involving transactions related to this contract or compliance with any clauses thereunder."[2] As previously stated, the contracts include clauses requiring compliance with the Trade Agreements Act. To comply with the Examination of Records clause, the contractor must first preserve these records. *See Appeal of Campbell*, No. 5954, 1982 WL 8866 (GSBCA June 30, 1982) ("[T]he Examination of Records clause requires the contractor to retain its records for a full three years after final payment.").

16.   Capitol's letter also asserted that "your request to 'visit and meet with' Capitol's owner is not supported by law," and that the request was "unwarranted and premature," and refused to "make the owner of Capitol available for an interview or to arrange for a site visit." As noted in the Attorney General Guidelines for Offices of Inspector General with Statutory Law Enforcement Authority (2003), the "Inspector General Act . . . established criminal investigative jurisdiction for the offices of presidentially appointed Inspectors General," which includes

---

[2] This clause appears, for example, in Capitol's contracts GS-02F-0100N and GS-06F-0070R. Contract GS-21F-0001K instead contains the similar clause at 48 C.F.R. § 552.215-71.

Capitol with a copy of the qui tam complaint. During discussions following Capitol's receipt of the complaint, the Department of Justice requested records of Capitol's government sales following the date when it appears Fellowes, Inc., moved its manufacturing operations to China. Capitol disputed that all of the Fellowes-brand products sold in this time period were of Chinese manufacture, but did not provide any manufacturer documentation of the products' country of origin.

18. On February 5, 2013, the United States filed a Complaint in Intervention in this matter with the Court.

Pursuant to 28 U.S.C. Section 1746, I hereby state under penalty of perjury that the foregoing Declaration is true and correct to the best of my knowledge.

Executed on: 15 April 2013

*[signature]*
CRYSTAL L. JOHNSON
Special Agent