**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

                    Petitioner,

          v.

CAPITOL SUPPLY, INC.,

                    Respondent.

Misc. No. 13-mc-0373 (BAH)

Judge Beryl A. Howell

## MEMORANDUM OPINION

The United States of America, on behalf of the Office of Inspector General for the

General Services Administration ("OIG"), filed the Petition for Summary Enforcement of two

Inspector General ("IG") Subpoenas *Duces Tecum* ("Petition"), which is pending before the

Court.  The subpoenas at issue seek to compel Capitol Supply, Inc. ("CSI"), to produce records

in connection with an OIG investigation of whether CSI violated the False Claims Act, 31 U.S.C.

§§ 3729 *et seq.*, by falsely certifying that office-grade shredders and other office supplies, which

CSI sold to federal agencies via government-sponsored websites, were manufactured in

compliance with the Trade Agreements Act ("TAA"), 19 U.S.C. §§ 2501 *et seq.*, and Buy

American Act ("BAA"), 41 U.SC. §§ 8301 *et seq*.  CSI does not dispute that the subpoenas at

issue were served in accordance with an official investigation conducted by, and within the

statutory authority of, OIG or that the subpoenas seek information relevant to this investigation.

Nevertheless, CSI opposes this petition for judicial enforcement of the two subpoenas on the

grounds that it has already "diligently complied," and that the subpoenas seek "documents that

do not exist" or are "already in the Government's possession."  CSI Opp'n U.S. Pet. Summ. Enf.

IG Subpoena ("CSI Opp'n") at 1, ECF No. 8. For the reasons discussed below, the Government's Petition for Summary Enforcement of the IG Subpoenas is granted.[1]

## I. BACKGROUND

### A. CSI's Business with the Federal Government

CSI offers for sale nearly one million different products from thousands of manufacturers to federal government customers under various GSA Federal Supply Schedule ("FSS") contracts, including Multiple Award Schedule Contract No. GS-02F-0100N for office supplies, through the Department of Defense's "EMALL" and GSA's "GSA Advantage!" websites. Decl. of Robert Steinman Supp. Opp'n U.S. Pet. Summ. Enf. IG Supboena ("Steinman Decl.") ¶ 2–3, ECF No. 8-1.[2] The Federal Acquisition Regulations ("FAR") prescribe standard federal contract clauses that are incorporated by reference into CSI's GSA contracts. Decl. of Crystal L. Johnson, Special Agent, OIG ("Johnson Decl.") ¶ 8a, ECF No. 1-1. Among those contract clauses are those that implement the requirements of the BAA and TAA. *Id.* Taken together, these two laws permit federal agencies to purchase products from foreign countries only when those countries are designated as providing "appropriate reciprocal competitive government procurement opportunities to United States products and suppliers of such products." 19 U.S.C. § 2511(b)(1); *see also id.* § 2518(1). China is not included on the list of designated countries. Johnson Decl. ¶ 8a (citing 48 C.F.R. § 25.003).

As part of its FSS contracts, CSI agreed to comply with applicable laws and regulations ensuring that products offered for sale or sold under this contract to the United States

---

[1] CSI's request for an oral hearing on the petition was granted and a hearing held on March 18, 2014. *See* CSI Opp'n at 1.

[2] According to the OIG, CSI holds the following current FSS contracts: GS-02F-0100N (office products); GS-30F-0019U (automotive superstore); GS-21F-0001K (hardware and appliances); GS-06F-0070R (hardware and appliances); and GS-27F-0028P (furniture). Decl. of Crystal L. Johnson, Special Agent, OIG ("Johnson Decl.") ¶ 7, ECF No. 1-1.

Government were U.S.-made or designated country end products.  Johnson Decl. ¶ 8a & b; *see also* 48 C.F.R. § 52.225-6(a)  ("The offeror certifies that each end product, except those listed in paragraph (b) of this provision, is a U.S.-made or designated country end product, as defined in the clause of this solicitation entitled 'Trade Agreements.'"); 48 C.F.R. § 52.225-5(b) ("The Contractor shall deliver under this contract only U.S.-made or designated country end products except to the extent that, in its offer, it specified delivery of other end products in the provision entitled 'Trade Agreements Certificate.'").  According to the OIG, submitting claims for payment for products sold through the FSS contracts, when those products do not conform to the certification that the end product is made in the U.S. or a designated country, "may constitute criminal false statements or civil false claims, in violation of 18 U.S.C. §§ 1001, 287, or 31 U.S.C. §§ 3729 *et seq.*, respectively."  Johnson Decl. ¶ 8b.  To ensure compliance with these obligations, federal contractors are required to maintain sales records for three years from the date of last payment and to permit the OIG to "have access to and the right to examine any books, documents, papers, and records of the Contractor involving transactions related to this contract or compliance with any clauses thereunder."  *Id*. at ¶ 15 (citing 48 C.F.R. 552.215-70).

### B.    OIG Initiation of Investigation

On June 29, 2010, relator Louis Scutellaro filed a *qui tam* complaint, which was placed under temporary seal, alleging that CSI was "selling products to the United States Government that did not originate in designated countries under the [TAA], and therefore . . . presenting false claims to the United States Government for payment."  *U.S. ex. rel. Scutellaro v. Capitol Supply, Inc.*, Civ. No. 10-01094 (D.D.C.), Compl. ¶ 5, ECF No. 1.[3]  After receiving the *qui tam*

---

[3] This *qui tam* complaint was partially unsealed on February 28, 2012 at the request of the United States for the limited purpose of disclosing its allegations to CSI.  *See* Order, dated Feb. 28, 2012, ECF No. 8.  Over eight months later, on October 12, 2012, the complaint and the Government's Notice of Election to Intervene in Part were unsealed.  *See* Order, dated October 12, 2012, ECF No. 20.  Almost one year after the complaint had been unsealed

complaint, the OIG initiated an investigation to "determine whether Capitol Supply unlawfully advertised, certified and sold office supply products, including paper shredders, to Federal agencies and offices pursuant to a GSA schedule contract." Johnson Decl. ¶ 6. In furtherance of its investigation, the OIG served two subpoenas on CSI, in 2010 and 2011, to obtain information pertinent to the sales of products by CSI through its FSS contracts with the GSA. CSI's compliance with those two subpoenas is at issue in the pending petition.

C.    **2010 Subpoena and Response**

On November 5, 2010, the OIG issued its first Subpoena, No. 1732 ("2010 Subpoena"), to CSI seeking production of all documents in CSI's possession from January 1, 2004 until November 4, 2010 "relating in any way to any sale of Fellowes brand shredders under any schedule contract" with the GSA. Pet. Ex. 1 ("2010 Subpoena") at 6, ECF No. 1-2. The 2010 Subpoena requested production of seven categories of documents related to the subject matter of the subpoena, including sales data of Fellowes shredders sold pursuant to any GSA schedule contract (No. l), correspondence and communications from suppliers regarding country of origin of those shredders sold (Nos. 2 and 6), information as to the country of origin of the shredders sold (Nos. 3 and 4), and the identities of employees who sold the shredders on behalf of CSI (No. 7). *Id.* at 6; *see also* Johnson Decl. ¶ 10.[4]

---

for disclosure to CSI, on February 5, 2013, the United States filed a Complaint in Partial Intervention on a portion of the relator's allegations pertaining to CSI's sales, totaling approximately $408,930.04, of Fellowes Manufacturing Company paper shredders to federal agencies through the GSA, with allegedly false certifications that the shredders were made in the United States or other designated countries, when, in fact, they were manufactured in China, a non-designated country, in violation, *inter alia*, of the False Claims Act, 31 U.S.C. § 3729(a)(1). *See* Compl.-in-Partial Intervention ¶¶ 14–25, ECF No. 2. In an oblique reference to the subject matter of the instant dispute over CSI's compliance with the two subpoenas at issue, the government's Complaint in Partial Intervention states that "[b]ecause [CSI] failed to fully comply with a subpoena issued by the GSA Office of the Inspector General, the United States believes that additional sales of non-compliant, Chinese-made products to the United States will be uncovered during discovery." *Id.* ¶ 13.

[4] The 2010 Subpoena requests the following seven categories of records: (1) sales data (including country of origin information) for sales of Fellowes-brand shredders; (2) correspondence pertaining to the country of origin of Fellowes-brand shredders sold through CSI's FSS contracts; (3) documents pertaining to the manufacture or

4

Shortly before the production deadline, CSI's counsel tried unsuccessfully to negotiate with the OIG to reduce the scope of the documents requested. *See* Decl. of Holly A. Roth Supp. Opp'n Pet. ("Roth Decl.") ¶ 3, ECF No. 8-2 (OIG Special Agent Johnson "did not substantively respond to my request to narrow the scope of the document production required by the 1732 Subpoena"). The parties were able, however, to reach an agreement permitting CSI to produce the requested documents in a "rolling fashion." Johnson Decl. ¶ 11 ("We agreed that [CSI] would produce responsive documents in a 'rolling fashion'").

CSI subsequently made two productions of material in response to the 2010 Subpoena. The first production, on three compact discs ("CDs"), consisted of 4,224 pages and several spreadsheets (Bates-number CS004220–21). CSI Opp'n Ex. D (letter, dated Dec. 23, 2010, from CSI counsel to OIG) at 2–3, ECF No. 8-4; CSI Opp'n at 3. As the cover letter from CSI counsel makes plain, two of the CDs contained "promotional" material sent to CSI by a vendor. *Id.* at 3. According to CSI, the spreadsheet "show[ed] all sales of Fellowes shredders from 2004 to 2010 under any contract." CSI Opp'n at 3; CSI Opp'n Ex. D at 2. The second production, on one CD, consisted of 113 Bates-stamped native documents. CSI Opp'n Ex. E (letter, dated April 26, 2011, from CSI counsel to OIG) at 1, ECF No. 8-5; CSI Opp'n at 3–4. Together, both productions "consisted of approximately 500,000 pages of documents, many of which were produced as native documents." Roth Decl. ¶ 4.

The OIG concluded that, although CSI's response to the 2010 Subpoena contained "sales information for Fellowes shredders for the time period 2004 to mid-December 2010," Johnson

---

assembly location of Fellowes-brand shredders sold through CSI's FSS contracts; (4) other documents pertaining to the country of origin of Fellowes-brand shredders sold through CSI's FSS contracts; (5) documents relating to the deletion of Fellowes-brand shredders sold through CSI's FSS contracts due to the shredders' country of origin; (6) documents Capitol received from its suppliers relating to Fellowes-brand shredders sold through CSI's FSS contracts; and (7) the names, positions, addresses, and titles of current and former CSI employees associated with sales of Fellowes-brand shredders under CSI's FSS contracts. Johnson Decl. ¶ 10.

Decl. ¶ 11, the response was insufficient in two respects. First, the documents produced only "pertained to [GSA Schedule Contract] GS-02F-0100N, though the subpoena called for material relating to Fellowes shredders sold through all of [CSI's] contracts." *Id.* Second, "[t]his spreadsheet include[d] only 11 items sold through schedules other than GS-02F-0100N," and "did not provide country of origin information for the vast majority of the models." Supp. Decl. Crystal L. Johnson, Special Agent, OIG ("Johnson Supp. Decl.") ¶ 3, ECF No. 11-1; Johnson Decl. ¶ 11 ("for 36 of the 46 Fellowes shredder models offered through Capitol's FSS contracts, Capitol did not provide documentation regarding country of origin"). Another problem with the spreadsheet was that, without "complete sales data," the OIG could not "confirm whether these represent all Fellowes sales under Capitol's schedule contracts." Johnson Supp. Decl. ¶ 3.

Notably, in a letter accompanying the first production responsive to the 2010 Subpoena, CSI's counsel informed the OIG that CSI simply may not have responsive documents, explaining that CSI's "historical documentation of country of origin is limited because [CSI] updates such information on the products it offers based on the most recent electronic download from its distributers." CSI Opp'n Ex. D at 2. CSI's counsel's letter transmitting the second production reiterated this limitation in CSI's country of origin data, stating that CSI "and its suppliers engage in an electronic interchange of data whereby the supplier automatically updates information on products it sells through [CSI]—including country of origin ("COO")" and "new supplier data for a given product –such as a Fellowes shredder—would replace, or overwrite, previous data in [CSI]'s system on that product." CSI Opp'n Ex. E at 1; *see also* Decl. of Robert Steinman, Chief Executive Officer, CSI ("Steinman Decl.") ¶ 6, ECF No. 8-1 ("the information in the databases was constantly being overwritten to reflect that latest information"); Johnson Decl. Ex. 2 (letter, dated April 10, 2012, from CSI counsel Holly A. Roth to Special Agent

Crystal Johnson) at 2, ECF No. 1-3 (CSI's counsel explaining that CSI's "electronic system does not maintain all of the information you have requested for the fields you have requested for the time periods you have requested" because CSI's "dynamic system . . . is designed to verify a compliant country of origin from vendor provided information, *e.g.*, the vendor feeds, in real time when [CSI] accepts and fulfills an order," but as "vendors frequently update information on the products [CSI] offers under the Contract, it is the most current information on the Country of Origin that is available on [CSI]'s system at any given time").

In short, the system employed by CSI to maintain country of origin information is constantly being overwritten with each new upload of updated information by vendors and this information is apparently not otherwise preserved by CSI. According to the OIG, this is inconsistent with CSI's contractual obligations. *See* Johnson Decl. ¶ 15 ("To comply with the Examination of Records clause, the contractor must first preserve these records."); Johnson Supp. Decl. ¶ 3 (noting CSI's contention "that it does not possess this information" but stating that CSI "is required to maintain this information under the terms of its schedule contract" and "it is not clear how it could now lack the information unless it was destroyed"). Moreover, CSI's reliance on information provided by its vendors means that CSI "necessarily relies on the accuracy of the [country of origin] data provided by its vendors." Steinman Decl. ¶ 5. Thus, CSI explains that "[i]f vendors provide inaccurate data—including inaccurate country of origin information—then [CSI's] databases will generally reflect those errors." *Id.*

### D.     2011 Subpoena and Response

On June 22, 2011, the OIG issued a second Subpoena, No. 1774 ("2011 Subpoena"), to CSI seeking production of all documents in CSI's possession from January 1, 2004 until June 21, 2011 "relating in any way to" Multiple Award Schedule Contract No. GS-02F-0100N. Petition

7

Ex. 3 ("2011 Subpoena"), at 6, ECF No. 1-4. The 2011 Subpoena requested the same seven

categories of documents listed in the 2010 Subpoena.[5] While the 2010 Subpoena requested

information related to Fellowes shredders sold under any Federal contract, the 2011 Subpoena

sought documentation about any product sold by CSI under a single Federal contract for the

same six and one-half year period.

CSI made four productions in response to the 2011 Subpoena. The first production of

16,923 documents, assigned Bates-stamped numbers 1–22208, was on an encrypted CD, which

the OIG could not access. CSI Opp'n Ex. F (letter, dated July 21, 2011, from CSI counsel to

OIG) at 1, ECF No. 8-6; Johnson Decl. ¶ 13.[6] The second production of documents contained

both the first production of 16,923 documents, as well as 36,258 new documents, assigned Bates-

stamped numbers 22209–773448, for a total of 53,181 pages of "purchase orders that [CSI] has

received from various Government agencies through DoD E-Mall and GSAAdvantage over the

past year," CSI Opp'n Ex. G (letter, dated July 26, 2011, from CSI counsel to OIG) at 1, ECF

---

[5] The seven categories of documents requested in the 2011 Subpoena are: (1) sales data (including country of origin information) for all products sold under the contract; (2) documents pertaining to the manufacture or assembly location of products sold through the contract; (3) documents CSI received from its suppliers relating to the country of origin of products sold through the contract; (4) other documents pertaining to the country of origin of products sold through the contract; (5) documents relating to CSI's efforts to comply with the TAA; (6) documents relating to the deletion of products from the contract due to their country of origin; and (7) the names, positions, addresses, and titles of current and former CSI employees associated with CSI's performance of the contract. Johnson Decl. ¶ 12; 2011 Subpoena at 6.

[6] CSI receives "data feeds [that] are generally text files, Excel spreadsheets, or Microsoft Access files," which the company's "computerized tools read, format, and upload into its databases." Steinman Decl. ¶ 4. At the hearing, the government indicated that production of the data feeds in these native formats would be usable and searchable so long as the individual entries are "delineated." *See* Rough Transcript of Motion Hearing (March 18, 2014) ("Tr.") at 15:11–21. The parties have not requested formal transcripts from the Court Reporter. Accordingly, the Court relies on the court reporter's rough transcript of the March 18, 2014 motion hearing in this Memorandum Opinion. According to the government's declarant, however, the data feeds produced were "a jumble of letters, numbers, and symbols." Johnson Decl. ¶ 13; *cf.* CSI Opp'n Ex. K at 3, ECF No. 8-11 (letter, dated April 10, 2012, from CSI's counsel to OIG, stating "we find it quite easy to identify the various pieces of information Subpoena No. 1774 is seeking, including the country of origin for each product"). The Court need not resolve whether the data feeds were a "jumble" or "easy to identify" but expects CSI to live up to its promise "to cooperate" and "provide such documentary evidence that it maintains to demonstrate its compliance with the Contract's Trade Agreements Act clause." *Id*. at 3.

No. 8-7, covering the period from August 2010 through April 2011.[7]  CSI Opp'n Ex. J (email, dated April 3, 2012, from OIG to CSI's counsel, noting that this production "doesn't cover the timeframe requested in the subpoena (January 1, 2004–June 21, 2011) and wasn't provided in excel format").  CSI's counsel acknowledged that these two productions "represented approximately six months of purchase orders, out of the 7.5 years of documents that the OIG initially requested."  Roth Decl. ¶ 9.

The third production of documents, assigned Bates-stamped numbers 73449–1563209, consisted of 1,489,760 pages of data feeds from CSI's various suppliers, which had been converted from .XML format to .PDF format and then encrypted.  CSI Opp'n Ex. H, ECF No. 8-8; *id*. Ex. I (email thread, dated February 2012, between CSI counsel and OIG); Johnson Decl. ¶ 13 (CSI's third production "contained 1,489,760 pages of data feeds from Capitol's various suppliers").  OIG could not access this information.  CSI Opp'n Ex. J (email, dated April 3, 2012, from OIG to CSI's counsel, noting number of pages in third production and that OIG "can't open this information").  Finally, the fourth production, on a hard drive, contained documents assigned Bates-stamp numbers 1563210–1575609 in native format of previously produced documents.  CSI Opp'n Ex. L (letter, dated April 27, 2011, from CSI's counsel to OIG).[8]

Again, the OIG concluded CSI's response to the 2011 Subpoena was deficient in at least two respects.  First, as CSI concedes, the submissions under the 2011 Subpoena consisted of only a fraction, or about six months' worth, of documentation when the subpoena called for seven and

---

[7] The Roth Declaration summarizes the total as "73,000 pages of documents," Roth Decl. ¶ 9, but does not explain the mathematical computation to get to this number given the numbers of the pages cited in the original letters transmitting the productions.

[8] CSI's opposition papers indicate that the company made "a fifth production of documents to OIG on April 27, 2011," CSI Opp'n at 7, but the transmittal letter cited describes the production as the "fourth production of documents," CSI Opp'n Ex. L.

a half years.  Roth Decl. ¶ 9; Johnson Decl. ¶ 13.  Second, while CSI "did produce a second set of what it maintains is country of origin documentation from its suppliers, this material did not in fact contain country of origin information.  Some of the documents lack part numbers or dates in addition to country of origin information."  Johnson Supp. Decl. ¶ 10.

Throughout the productions in response to the 2010 and 2011 Subpoenas, CSI complained about the cost and burden resulting from compliance.  For example, CSI stated that it could not "simply produce the databases containing this information" because "[t]hey [were] extraordinarily complex, with many hundreds of data tables, hundreds of stored procedures, and millions of lines of code."  Steinman Decl. ¶ 12.  As a by-product of attempting to comply, CSI asserted that it needed to lay "off nine personnel, or about 20% of its work force, in part because of the costs of this litigation."  *Id.*  For CSI, this was particularly frustrating because they believed that the Government was already in possession of the requested documents as the purchaser of the products sold by CSI.  *Id.* at 13.  The OIG disputes that the Government possessed the requested documents because "[w]ith respect to sales of those products, only a fraction of those sales [were] made through the GSA Advantage! website.  Therefore, the GSA OIG does not have information on all of [CSI]'s FSS sales."  Johnson Supp. Decl. ¶ 6.

Remaining dissatisfied with the completeness of production, the OIG now seeks judicial enforcement of the subpoena.  *See* Pet. ¶ 8.

## II.     LEGAL STANDARD

The court's role in determining the enforceability of an administrative subpoena is "strictly limited."  *FTC v. Texaco, Inc.*, 555 F.2d 862, 872 (D.C. Cir 1997).  The D.C. Circuit has explained that the Supreme Court has "confined the judicial role" in evaluating an administrative subpoena enforcement petition "to determining whether 'the inquiry is within the authority of the

agency, the demand is not too indefinite and the information sought is reasonably relevant.'" *U.S. Int'l Trade Comm'n v. ASAT, Inc*., 411 F.3d 245, 253 (D.C. Cir. 2005) (quoting *United States v. Morton Salt Co*., 338 U.S. 632, 652–53 (1950); *see also Texaco*, 555 F.2d at 872; *Resolution Trust Corp. v. Walde*, 18 F.3d 943, 946 (D.C. Cir. 1994); *FTC v. Boehringer Ingelheim Pharm., Inc.*, 898 F. Supp. 2d 171, 174 (D.D.C. 2012); *United States v. Inst. for College Access & Success*, No. 13-mc-81, 2013 U.S. Dist. LEXIS 104704 (D.D.C. July 26, 2013). This circumscribed judicial role is designed to further the "important governmental interest in the expeditious investigation of possible unlawful activity." *Texaco*, 555 F.2d at 872.

Agencies are accorded "extreme breadth in conducting [their] investigations," *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp*. ("*Linde Thomson*"), 5 F.3d 1508, 1517 (D.C. Cir. 1993), because "'a wide range of investigation is necessary and appropriate where, as here, multifaceted activities are involved, and the precise character of possible violations cannot be known in advance,'" *id*. (quoting *Texaco*, 555 F.2d at 877). Thus, agencies are given broad deference both in their interpretation of the scope of their authority to issue a subpoena for targeted records and their estimation of the relevance of such records. *See FTC v. Church & Dwight Co*., 665 F.3d 1312, 1315–16 (D.C. Cir. 2011) (noting, "we defer to the Commission's interpretation of its own Resolution"); *FTC v. Ken Roberts Co*., 276 F.3d 583, 586–87 (D.C. Cir. 2001) ("we have held that enforcement of an agency's investigatory subpoena will be denied only when there is "a patent lack of jurisdiction" in an agency to regulate or to investigate"); *FTC v. Ernstthal,* 607 F.2d 488, 492 (D.C. Cir. 1979) (declining to "relax the well-established barrier against ruling on the agency's regulatory jurisdiction in subpoena enforcement proceeding . . . where the absence of jurisdiction is not patent, and there are no allegations of agency bad faith"). Indeed, the D.C. Circuit has instructed that an agency's

determination of relevance of the information sought in an administrative subpoena should not be disturbed or "rejected" unless it is "obviously wrong." *FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1089 (D.C. Cir. 1992); *see also United States v. Legal Servs.*, 249 F.3d 1077, 1084 (D.C. Cir. 2001) (same); *Dir., Office of Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304, 1307 (D.C. Cir. 1997) ("We give the agency a wide berth as to relevance because it need establish only that the information is relevant to its investigation not to a hypothetical adjudication, and as we have explained, the boundary of an investigation need only, indeed can only, be defined in general terms.").

Consequently, the burden of showing that an administrative subpoena is unreasonable rests on the subpoenaed party and "is not easily met." *Texaco*, 555 F.2d at 882.

## III. DISCUSSION

As noted, CSI does not contest the authority of the OIG to issue the 2010 and 2011 subpoenas, nor the definiteness and relevance of the information sought.[9] *See generally* CSI Opp'n. Instead, CSI contends that the company has "diligently complied" with the subpoenas through production of "more than 2 million pages of documents." CSI Opp'n at 1; *see also id*. at 8 (noting that CSI has made "good-faith efforts to comply" with the subpoena request). In opposing the pending petition for enforcement of the administrative subpoenas, CSI raises two arguments: (1) that the United States' intervention in the related *qui tam* action renders the

---

[9] Indeed, under the Inspector General Act of 1978, the OIG possesses the authority "to conduct, supervise, and coordinate audits and investigations relating to the programs and operations of [the agency and to] . . . prevent[] and detect[] fraud and abuse in [the agency's] programs and operations." 5 U.S.C. App. 3 § 4. In exercising this authority and carrying out its investigative functions, the OIG may "require by subpoena the production of all information . . . and documentary evidence necessary in the performance of [its] functions." *Id.* § 6(a)(4). In view of this broad authority and the subject matter of the documents demanded, the two subpoenas are lawful and seek relevant records. The Court does not construe CSI's discounting of the pending Petition as "a series of meritless quibbles, combined with a series of demands for documents that [CSI] has already provided or that do not exist," CSI Opp'n at 8, to be challenging the relevance of the documents sought.

enforcement proceeding moot; and (2) that the OIG demand for further compliance with the subpoenas is unreasonable. These arguments will be addressed *seriatim*.

### A. Subsequently Filed Civil Suit No Bar To Subpoena Enforcement

The Court first turns to CSI's threshold argument that the United States' partial intervention in the *qui tam* action brought by relator Louis Scutellaro has rendered this summary enforcement proceeding "duplicative and moot" because "the document requests are properly governed by the Federal Rules of Civil Procedure." CSI Opp'n at 16. CSI fails to cite any case law in support of this proposition. *See generally* CSI Opp'n. That is because case law in this Circuit falls squarely against CSI's position. The D.C. Circuit has unequivocally stated that the filing of a subsequent criminal or civil action has no effect upon the enforceability of an administrative subpoena issued by a body with significant investigative powers. *See Linde Thompson.*, 5 F.3d at 1518 ("Nor does the statute authorizing RTC investigations contemplate the termination of investigative authority upon the commencement of civil proceedings."); *Resolution Trust Corp. v. Frates*, 61 F.3d 962, 965 (D.C. Cir. 1995) (filing of civil case did not deprive agency of subpoena power since it could mean that agency "was still searching for further evidence of the extent of [subpoena recipient's] wrongdoing or the value of the claims"); *Resolution Trust Corp. v. Walde*, 18 F.3d 943, 950 (D.C. Cir. 1994) (rejecting subpoena recipient's argument that the administrative subpoena was moot due to the agency's filing of a federal civil suit).

On this point, *Linde Thomson* is dispositive. In *Linde Thomson*, the Resolution Trust Corporation ("RTC") issued a subpoena *duces tecum* upon the Linde Thomson law firm, which had significant connections to a failed thrift savings and loan bank. *Id.* at 1510. Linde Thomson refused to comply with the subpoena, citing a subsequently filed civil suit as rendering the

enforcement proceedings moot. *Id.* at 1512. The D.C. Circuit did not agree, finding that Congress granted RTC the authority to issue administrative subpoenas and placed no further limitation upon their enforcement—including the filing of a civil suit over the same subject matter. *Id.* at 1518 ("In this case . . . the investigative powers authorized by statute are unrestricted").

As in *Linde Thomson*, Congress has granted the OIG the unrestricted authority to issue administrative subpoenas to root out fraud and abuse. *See* 5 U.S.C. App. 3 (creating independent and objective offices to root out fraud and abuse). Because the OIG has been granted the broad prerogative to issue administrative subpoenas in this case, no subsequently filed civil suit renders the proceeding moot. Thus, this proffered basis for excusing CSI's further compliance with the two subpoenas at issue is meritless.

## B. Compliance With Subpoenas Insufficient

The Court next turns to CSI's opposition to providing further records in response to the two administrative subpoenas on grounds that the Petition is "unreasonable" because CSI "has fully complied with this request." CSI Opp'n at 9. According to CSI, this "small business" has already "been forced to incur significant legal fees and the costs of an outside document vendor in order to comply." *Id.* at 8; *see also* CSI Sur-Reply to U.S. Pet. Summ. Enf. IG Subpoena ("CSI Sur-Reply"), at 1, 8, ECF No. 15 (noting CSI's "great lengths to produce documents" "despite the significant burdens on [CSI]"). Any further compliance burden would be unreasonable, in CSI's view, because the Petition seeks "documents that have already been produced, documents already in the Government's possession, or documents that do not exist." CSI Opp'n at 1; *see also id.* at 8 (petition seeks documents "already provided or that do not exist"). Thus, as noted, CSI is not contesting the relevance of the records sought, but whether

any further compliance with the subpoenas presents an undue burden. While the degree of burden often is "related to relevance," the Court is cognizant that "subpoenas might be relevant but still unduly burdensome." *Legal Servs.*, 249 F.3d at 1083–84.

It cannot be gainsaid that "some burden on subpoenaed parties is to be expected and is necessary in furtherance of the agency's legitimate inquiry and the public interest." *CFTC v. McGraw Hill Cos*. (*In re Application to Enforce Admin. Subpoena*), 390 F. Supp. 2d 27, 35 (D.D.C. 2005) (quoting *Texaco, Inc.*, 555 F.2d at 882); *see also* 48 C.F.R. § 552.215-70 (OIG is permitted to "have access to and the right to examine any books, documents, papers, records of the Contractor"). To establish an undue burden, the subpoenaed party resisting enforcement must show that the "compliance threatens to unduly disrupt or seriously hinder normal operations of a business." *United States v. Chevron U.S.A., Inc.*, 186 F.3d 644, 649 (5th Cir. 1999); *see also United States v. Cal. Rural Legal Assistance*, *Inc.*, 824 F. Supp. 2d 31, 46 (D.D.C. 2011) ("'respondent would have to make a substantial showing of hardship for this Court to determine that the burden . . . of complying with the subpoena is undue"), *aff'd in part, vacated in part, remanded*, 722 F.3d 424 (D.C. Cir. 2013) (affirming district court's determination on burden). In evaluating any claim of hardship arising from subpoena compliance, however, the context is important. Here, CSI does not dispute that the company has contractual obligations under its government contracts both "to preserve all contemporaneous records received from its suppliers regarding the country of origin of its products . . . for three years from the date of the last payment under the contract" and "to maintain its records so as to allow the production and/or conversion of those records and other electronic data to a readable and usable form for the GSA." U.S. Reply Resp.'s Opp'n U.S. Pet. Summ. Enf. IG Subpoenas ("U.S. Reply") at 4, ECF No. 11 (citing 48 C.F.R. §§ 4.703, et seq., 552.215-70). The

government stresses that applicable regulations make clear that government "contractors must maintain their records in a '**readable form** from one reliable computer medium to another,' and 'shall not destroy, discard, delete, or **write over** such computer data.'" *Id*. (citing 48 C.F.R. §§ 4.703) (emphasis in original). It is set against this regulatory context that the Court evaluates CSI's objections to further subpoena compliance.

Without getting mired in the minutia of the back-and-forth between the parties since the 2010 Subpoena was issued, the objections posed by CSI to the pending Petition and further compliance with the subpoenas appear to fall into three areas: (1) CSI has already produced voluminous documents and further production would be an undue burden on this "small business," CSI Opp'n at 1; *id*. at 5, 6; (2) CSI has produced documents in the format in which the documents are received and has no obligation to convert records into any other format requested by the OIG, CSI Opp'n at 12–13; CSI Sur-Reply at 2, 4; and (3) CSI has no obligation to produce records already in the government's possession, CSI Opp'n at 10; CSI Sur-Reply at 7. These objections are unavailing in the context of this case.

*1. Production To Date Is Insufficient*

CSI has argued to the OIG since receipt of the 2010 Subpoena that, due to the sheer volume of orders processed by CSI during the time period requested in the two subpoenas, the subpoenas are both "extraordinarily broad and burdensome," but the company has nonetheless made efforts to comply. CSI Opp'n at 6 (quoting CSI Opp'n Ex. K (CSI's counsel letter, dated April 10, 2012, to OIG)). In support of this assertion, CSI notes that the company has already produced nearly 1.5 million pages, which has "cost many thousands of dollars in programming

time as well as lost productivity." Steinman Decl. ¶ 9.[10] Thus, CSI's position with respect to the pending Petition for subpoena enforcement boils down to a protest that "enough is enough."

Notwithstanding CSI's repeated protestations about diligence in producing all requested records, the company concedes that it has not produced "the purchase orders for the entire date range" demanded in the subpoenas and states that it "is more than willing to produce these documents." CSI Opp'n at 11. This reason alone warrants granting the Petition.

CSI also concedes that it has failed to produce country of origin data for all of the Fellowes shredders it sold between 2004 and 2010, representing $492,491 in sales. CSI Opp'n at 10, 13 n. 2; CSI Sur-Reply at 7 (CSI "has produced all available country-of-origin information that it has been able to discover after a diligent search"). The company's excuse for the gaps in documentation regarding this critical information requested by the subpoenas is that such documentation no longer exists since the "dynamic" system employed by CSI regularly and routinely over-writes this information as vendors update their product descriptions. CSI Opp'n Ex. E at 1; Steinman Decl. ¶ 6 ("[T]he information in the databases was constantly being overwritten."). By choosing to be part of the federal contracting program, CSI assumed the burden of maintaining country of origin status documentation for all of their products. *Accord Int'l Bhd. of Teamsters v. Goldberg*, 303 F.2d 402, 407 (D.C. Cir. 1962 ) (enforcing subpoena issued by Secretary of Labor to the Teamsters because "[i]t seems plain that, when the appellant union chose to file . . . it assumed the burden imposed by the statute of maintaining the necessary records in respect to the report which it chose to file"). CSI's admitted over-writing of

---

[10] CSI summarizes its subpoena response, stating the company has "made five productions of documents to the OIG, totaling approximately 2 million pages of documents in response to the two subpoenas." CSI Opp'n at 7. The number of pages produced to date by CSI sounds impressive but this number is misleading. Given the issues that the OIG encountered in trying to access certain productions in response to both subpoenas, *see* Johnson Decl ¶ 13; Johnson Supp. Decl. ¶ 10, CSI was prompted to make duplicate productions to the OIG. The total of "1.5 million pages" or "approximately 2 million pages" touted by CSI thus appears to be double-counting some number of pages.

information required to be retained under its contractual obligations with the government is not so easily excused. Rather, CSI will have to bear the consequences of failing to fulfill these obligations.[11] In short, CSI is not excused from compliance with its government contract obligations because it has relied upon proprietary databases and employed a system of records management that triggers a significant burden in complying with OIG requests for documents.

At the hearing on the Petition, CSI's counsel indicated that, to the best of his knowledge, the company had no backup system for the company's databases that would provide access to additional information that the company was required to maintain. *See* Rough Transcript of Motion Hearing (March 18, 2014) ("Tr.") at 21:8–12; 21:23—22:10. In the event that CSI has no backup system or other mechanism to retain country-of-origin information, which CSI was required, but claims to have failed, to preserve for the requisite contractual period, CSI will have to certify this fact. Indeed, at the hearing, the government made clear that, given CSI's representations about the lack of additional responsive information regarding country-of-origin information for the Fellowes shredders or other products sold under the relevant GSA contracts, the company must certify this fact. Tr. at 5:24–6:5. Such certification by CSI may carry concomitant penalties under the government contract and have consequences in the related civil litigation between the parties. Obviously, however, if the documents do not exist, their production cannot be compelled. *See Tech v. United States*, 284 F.R.D. 192, 198 (M.D. Pa.

---

[11] CSI describes the mechanism it uses to collect and verify country of origin information as follows: "[a]ppropriate vendors are chosen to fulfill an order by [CSI]'s automated vendor selection tool . . . [which] includes a feature to identify countries of origin and block sales of products that were manufactured in countries not designated under the Trade Agreements Act, based on information provided by the vendors in their data feeds." Steinman Decl. ¶ 5; *id.* ("Because [CSI] is not involved in the manufacturing of products offered to the Government for sale under the Office Supply Contract, it necessarily relies on the accuracy of the data provided by its vendors."). Thus, CSI is wholly dependent upon the accuracy of the country of origin information provided by its vendors and on the effectiveness of its "vendor selection tool" which "includes a feature to identify countries of origin and block sales of products that were manufactured in countries not designated under the Trade Agreements Act." *Id.* It is beyond the purview of this litigation to evaluate whether CSI's system employs adequate safeguards to protect against vendor or manufacture misstatements about country of origin information and to ensure the effectiveness of its "vendor selection tool" in blocking non-compliant products.

2012) ("It is clear that the court cannot compel the production of things that do not exist.  Nor can the court compel the creation of evidence by parties who attest that they do not possess the materials sought by an adversary in litigation."); *Baker v. Perez*, 2011 U.S. Dist. LEXIS 94613, 7–8 (E.D. Cal. Aug. 24, 2011) ("the court cannot order defendants to produce documents that do not exist"); *United States v. Carell*, 2011 U.S. Dist. LEXIS 57435, 9–19 (M.D. Tenn. May 26, 2011) ("a party 'cannot be expected to produce documents which do not exist'" (quoting *Williams v. Schueler*, 2006 U.S. Dist. LEXIS 43007, 2006 WL 1728123 at * 2 (E.D. Wis. June 23, 2006))).

*2. CSI's Production Format*

The 2010 and 2011 Subpoenas request that CSI produce responsive sales data "in electronic format (can be in the following formats: Database (.DBF), Access (.MBD), or Excel (.XLS)."  2010 Subpoena at 6; 2011 Subpoena at 6.  CSI asserts that it has "strictly complied with this demand to the best of its ability" but "does not maintain the information in any of the formats demanded by the Government . . . ."  CSI Sur-Reply at 2; *id*. at 4 (CSI "does not maintain any sales data in the electronic formats specified by the Government in its subpoena").  Consequently, CSI produced "purchase orders in PDF format, *just as it received these documents from the Government*," and "Department of Defense sales data in .edi format, *just as it received these documents from the Government*."  CSI Sur-Reply at 5 (emphasis in original).  According to CSI, the .PDF and .EDI formats are not proprietary and should be formats easily accessible to the OIG since "the Government itself created these documents that it now claims that it cannot access."  *Id*.

CSI fails to address a critical point.  The ability to access the contents of a record in a particular format is simply not the same thing as being able to efficiently or effectively use

19

records in that format. As the government's declarant suggests, "tens of thousands of PDF invoices," each of which must be opened individually for review, are not in as usable a format as one that would allow for searches to identify and easily extract information subject to appropriate queries. *See* Johnson Supp. Decl. ¶ 8. *See also D'Onofrio v. SFX Sports Group. Inc.*, 247 F.R.D. 43, 47 (D.D.C. 2008) ("If, however, it is not stored in a directly obtainable medium, a request may be made of the responding party to translate the electronic data into a "reasonably usable form." (quoting Fed. R. Civ. P. 34(a)(1)(A)).

The parties appear to be talking past each other. CSI accuses the government of requiring the company "to *interpret* the data for them, pulling out the country of origin information for each product from that jumble and linking it to specific sales of shredders," a task that CSI claims is "beyond the scope of the subpoena, beyond the requirements of the Federal Rules, and beyond the scope of the Inspector General Act." CSI Sur-Reply at 8 (emphasis in original). The government, on the other hand, states that CSI's production of "native versions" of sales data "did not in fact contain country of origin information [and] lack[ed] part numbers or dates." Johnson Supp. Decl. ¶ 10. Thus, this production was simply insufficient—a circumstance that may be due to CSI's over-writing of pertinent data on its databases.

Moreover, rather than tasking CSI to "interpret" its production, as CSI asserts, the government simply sought the results of any database query to be produced in a usable format. Specifically, the government's declarant explains, "contractors maintain this information in a variety of databases . . . [and OIG] offers subpoena recipients examples of formats in which the contractor may produce the results of a query of its system, understanding that, in the course of running its business, the contractor must query its system and request a usable format for results on a regular basis." *Id.* ¶ 9. The fact that CSI's databases may lack the functionality to run

20

queries for country of origin information to facilitate responses to the OIG subpoenas does not relieve this government contractor from responding to the OIG subpoenas with responsive information in a usable, searchable format. CSI must live with the consequences if, as the government declarant speculates, CSI "has chosen to store its only electronic data regarding government sales in a system from which information cannot be extracted (not the limber custom-designed system [CSI] described)." *Id*. ¶ 8. Accordingly, to the extent that CSI has retained information responsive to the subpoenas, it is required to produce that information in a format that is reasonably usable, which includes searchable, just as its databases are presumably designed to respond to search queries.[12]

> *3. CSI's Refusal to Produce Records Purportedly Already in Government's Possession*

CSI claims that it should be relieved of any further obligation to produce sales data documents in response to the subpoenas because "nearly 75% of the sales data that the Government seeks is already in its possession." CSI Sur-Reply at 7; *see also* CSI Opp'n at 13 ("Producing the databases would be essentially useless to the Government, particularly since it already has in its possession the information that it currently demands."). CSI's objection is unavailing for at least two reasons.

First, the purpose of the OIG's subpoenas is not merely to discern country of origin for all of the Fellowes shredders sold by CSI on its government contracts, but also to assess whether CSI was aware at the time of its FSS certification that products were manufactured in non-compliance with the BAA and TAA. U.S. Reply at 3. Thus, whatever sales documentation may

---

[12] Additionally, at the hearing, the government indicated that CSI has refused to provide passwords to encrypted documents that contain sales data related to CSI's sales through the Department of Defense's EMALL website. CSI is directed to provide any passwords to encrypted documents that CSI has not yet provided to the OIG in response to these subpoenas.

be extant in the government's possession does not necessarily reflect what CSI precisely knew when.[13]

Second, contrary to the premise of CSI's argument that the government has the majority of the sales data records in its possession, according to the government's declarant, GSA only maintains records for a small number of sales made by merchants on the GSA Advantage! Website. Johnson Supp. Decl. ¶ 6. The government's declarant explains that "[t]he United States does not already possess information relating to the country of origin of [CSI]'s products [because] . . . only a fraction of those sales are made through the GSA Advantage! Website . . . [and] the FSS program involves sales by multiple federal agencies through a variety of sales platforms…" Johnson Supp. Decl. ¶ 6. Indeed, CSI concedes that the GSA Advantage! website is only one of multiple platforms used by CSI to market and sell its products to federal agencies. *See* Steinman Decl. ¶ 3 ("Instead, [CSI] posts products for sale to the Government on the GSA Advantage website, Department of Defense EMALL website, and Capitol Supply's own website."). Thus, not only does the government not retain the sales data subject to the subpoenas, but also the government would have difficulty collecting information from across multiple federal agencies about sales made by CSI via multiple platforms. *See* Supp. Decl. Johnson ¶ 6.

Accordingly, CSI is not excused from compliance with the subpoenas with respect to production of information, which it is required to retain, even when that information is purportedly in the government's possession.

---

[13] The government apparently obtained country of origin information about CSI's sales of Fellowes shredders from sources other than CSI. U.S. Reply at 9–10; Johnson Supp. Decl. ¶ 7.

## IV.    CONCLUSION

The United States Petition for Summary Enforcement of an Inspector General Subpoena

is granted.  An appropriate Order consistent with this Memorandum Opinion will issue.


Date: March 19, 2014


_____
BERYL A. HOWELL
United States District Judge