UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

Misc. No. 1:13-mc-00373 (BAH)

Petitioner,

v.

CAPITOL SUPPLY, INC.,

Respondent.

______________________________/

**DEFENDANT CAPITOL SUPPLY, INC.'S RESPONSE OPPOSING**
**PETITIONER'S MOTION FOR SANCTIONS**

Pursuant to Fed. Rs. Civ. P. 26, 37, 45, and other applicable federal law, Defendant Capitol Supply, Inc. (hereinafter "Capitol") respectfully opposes the United States' (hereinafter the "Government") Motion for Sanctions. [D.E. 20]. Capitol complied with this Court's Order by producing approximately 350,000 additional pages of information. In addition, in order to satisfy the Government's requests for information, on July 10, 2014, Capitol invited the Government to directly inspect and copy from Capitol's computer databases all available information regarding sales data and Country of Origin ("COO") data. The Government *declined* to inspect and copy the documents it has requested, although this would have fully satisfied the Government's requests for information. Curiously, the Government's Motion mentions neither Capitol's offer of inspection nor the Government's refusal to undertake that inspection. Instead of taking the opportunity to take what it was requesting, the Government in bad faith chose to move for sanctions. Because Capitol has complied with the Court's Order and offered to allow the Government to inspect and copy everything the Government has requested, the Motion is moot.

In support of this Response, Capitol avers that:

1. Capitol Supply is a small business that has its principal and only office in Sunrise, Broward County, Florida. Capitol sells products to, amongst other purchasers, the Government.

2. Capitol's sales to the Government are in large part automated and handled electronically. Capitol's books, records, data, and employees with knowledge regarding its sales to the Government are located within Broward County, Florida.

3. The Government has alleged that a very small percentage of Capitol's sales to the United States have not complied with the Trade Agreements Act and False Claims Act because the products at issue – Fellowes paper shredders – were allegedly manufactured outside of the United States. Capitol denies these allegations.

4. In the case at bar, the Government issued two subpoenas *duces tecum* to Capitol for various broad categories of information.

5. On March 18, 2014, the Court held a hearing on the Government's Motion to Compel Compliance with the Subpoenas. At the time of the March 18, 2014 hearing, Capitol had already produced more than 2 million pages of documents to the Government in compliance with the Subpoenas. Although the Court noted in its March 19, 2014 Order (D.E. 16) that this number "is misleading" because it "appears to be double-counting some number of pages," this is not the case. In fact, this number refers to unique pages produced to the Government. Since that March 18, 2014 hearing, Capitol has produced an additional 350,000 pages of documents (approximately) to the Government.

6. At the March 18, 2014 hearing, Capitol's counsel did not personally appear because he was unaware of the hearing before it occurred. Capitol's counsel only became aware of the hearing after receiving a call from the Court's clerk, and he appeared by telephone. *See* Tr., 3:14-24 (Mar. 18, 2014) (**Exhibit "1"**). Moreover, the two attorneys who had previously

been the primary attorneys working on the case had recently left the firm, and they were not at the hearing and were not aware of the hearing. Rather than ask for a continuance, Capitol's counsel's argument primarily consisted of telling the Court that he did have enough information to answer the Court's questions. When counsel spoke, he often was not well enough versed in the background to provide accurate and/or complete answers to the Court. In short, counsel was not familiar with the issues and was ineffective at the March 18, 2014 hearing.

7. One of the Government's issues at the March 18, 2014 hearing was that Capitol had failed to "certify" that it had no other responsive documents.

8. In order to stop debating with the Government whether it had complied with the Court's Order, on July 10, 2014, Capitol invited the Government to visit Capitol's principal place of business, and proposed allowing the Government to directly search through Capitol's computer servers and databases to inspect and copy as they are kept in the ordinary course of business whatever sales information the Government chose to copy. ***The Government spurned that offer, and refused to inspect or copy Capitol's documents.*** Instead of taking the opportunity to inspect and copy information directly from Capitol's computers, the Government continued to try and manufacture a discovery dispute for strategic advantage, and the Government filed its Motion for Sanctions.

## I. LEGAL AUTHORITY

Regrettably, the Government's Motion omits from its legal recitation of authority one-half of the controlling authority on the requirements for a finding of civil contempt in this district. While it is correct that a party moving for a civil contempt finding must show "by clear and convincing evidence that: (1) there was a court order in place; (2) the order required certain conduct by the defendant; and (3) the defendant failed to comply with that order." *International*

*Painters & Allied Trades Industry Pension Fund v. ZAK Architectural Metal & Glass LLC,* 736 F.Supp.2d 35, 38 (D.D.C. 2010). The Government's Motion fails to bring to the Court's attention the remainder of the same paragraph in the *Int'l Painters* opinion:

> Once the court determines that the movant has made the above three-part showing, ***the burden shifts to the defendant to justify the noncompliance by***, for example, demonstrating its financial inability to pay the judgment or ***its good faith attempts to comply.*** *Id.* at 16–17. In both cases, however, the justifications must be accompanied by adequate detailed proof.

*Int'l Painters*, 736 F.Supp.2d at 38 (emphasis added).

Here, Capitol has in good faith attempted to comply with the Government's subpoenas, going so far as to invite the Government to inspect and copy its sales and COO databases as they are maintained in the ordinary course of business. Moreover, after this Court's March 18, 2014 Order, Capitol produced approximately another 350,000 pages of documents to the Government in addition to the approximately 2 million pages of documents Capitol had already produced. Capitol then informed the Government, through counsel, that it has produced all of the responsive documents as they are maintained in the ordinary course of business. The Government disagreed. Capitol then invited the Government to inspect Capitol's own databases, books, and records and to copy whatever the Government believes to be lacking. Such a resolution would have been the most efficient way of proceeding: instead of the Government drafting a Motion for Sanctions and running to this Court to continue to dispute what it received, Capitol offered to allow the Government to undertake a direct search and to inspect and copy the sales and COO data it seeks. The Government chose not to undertake that opportunity.

Rules of Civil Procedure 34(a) and 34(b)(2)(E) governs the production of ESI. Rule 34(a)(1) permits the responding party "to produce and permit the requesting party to … inspect, copy, test, or sample … any … electronically stored information …" The procedure for

complying with the request is set forth in Rule 34(b)(2)(E):

> *Producing the Documents or Electronically Stored Information.* Unless otherwise stipulated or ordered by the court, these procedures apply to producing documents or electronically stored information:
>
> (i) **A party must produce documents as they are kept in the usual course of business** or must organize and label them to correspond to the categories in the request;
> (ii) If a request does not specify a form for producing electronically stored information, **a party must produce it in a form or forms in which it is ordinarily maintained** or in a reasonably usable form or forms; and
> (iii) **A party need not produce the same electronically stored information in more than one form.**

Fed.R.Civ.P. 34(b)(2)(E) (emphasis added); see also *U.S. v. Briggs*, 831 F.Supp.2d 623, 628 (W.D.N.Y. 2011)("In a civil action, the responding parties to discovery demands are not obligated under the Federal Rules to organize their records to suit the requested party's demands. Civil Rule 34(b)(2)(E) gives the responding party the option either to produce the documents in the manner they are usually kept or produce them in the categories sought."). The manner in which the production is made is controlled by the responding party (Capitol). *See Pass & Seymour, Inc. v. Hubbell, Inc.*, 255 F.R.D. 331, 334 (N.D.N.Y. 2008) (under Civil Rule 34(b)(2), the responding party clearly controls the manner of production and which two methods would be employed). Under Rule 45(1)(D), "[a] command in a subpoena to produce … electronically stored information …. requires the responding person to permit inspection, copying, testing, or sampling of the materials." Capitol has done exactly this by permitting the Government to inspect and copy its sales and COO data.

Producing electronically stored information as it is ordinarily maintained is authorized by Rule 34(b)(2)(E). *Anderson Living Trust v. WPX Energy Production, LLC*, 298 F.R.D. 514, 516-517 (D. N. Mex. 2104). The producing party has the option under the Rule as to whether to produce in the form in which the data is ordinarily maintained – the option Capitol has elected by

offering to the Government to inspect and copy the data as it is ordinarily maintained – or to produce it separately in a reasonably usable form or forms. Capitol has satisfied its obligation under Rule 34(b)(2)(E)(ii) by offering the inspection. Capitol has also produced the information sought by the Government in a reasonably usable form, as set forth below.

It is in that context that the whole of the sanctions motion must be considered. "When selecting what sanction to impose, a court must 'exert only so much authority of the court as is required to assure compliance.' Moreover, 'sanctions imposed in civil contempt proceedings therefore ordinarily are conditional, and a person or entity held in civil contempt may avoid the sanctions by promptly complying with the court's order." *Int'l Painters*, 736 F.Supp.2d at 38 (citations omitted). On other words, if the Court were to decide that Capitol is in contempt, the remedy is to cause compliance. Yet Capitol has already offered up the production as permitted under Rule 34. The compliance the Government is requesting has already been offered. The Court should not tolerate the Government's deliberate choice to consume judicial resources where there was no need to do so; and its decision to try to create a side-show of discovery issues where no legitimate issues exist. In any other milieu, the Government would be focusing on getting the documents it wants or needs. In this case, the Government has disingenuously chosen not to inspect and copy those documents, and instead has decided to complain that it does not have the documents which it was offered and which it declined to inspect and copy.

Instead of undertaking its inspection, the Government takes issue with various portions of Capitol's production. However, the Government's assertions in its Motion do not track the proceedings before this Court, and they mischaracterize the production that has occurred.

## II. THE GOVERNMENT FAILS TO PROVIDE ANY EVIDENCE OF NONCOMPLIANCE

The Government cites four examples in which it complains that Capitol has failed to

comply with this Court's Order: a) the production of sales data in PDF form; (b) the production of COO information; (c) the production of Department of Defense sales data; and (d) the production of a load file. None of these complaints have any merit. In fact, only through serious mischaracterizations of the Court's Order can the Government claim that Capitol failed to comply with that Order.

**A. Production of Sales Data**

In its Subpoenas, the Government requested, among other information, sales data for products sold to the Government through its contracts with the General Services Administration (GSA). Capitol initially produced more than 73,000 pages of sales data to the Government as a sample of the documents that it possessed. [D.E. 8 at p. 5]. These documents were produced in searchable PDF format, precisely as they are maintained in Capitol's files. Capitol then repeatedly reached out to the Government *on at least six occasions* to determine whether the Government wanted Capitol to produce all such materials that it had in its possession, given the burden on Capitol that this presented and given the fact that all this information was already in the Government's possession as the purchaser of these products. *Id.* However, the Government refused to respond in any way, but instead filed its Petition for Summary Enforcement. [D.E. 1]. The Government acknowledged that "Capitol was not required to create documents in order to comply with the subpoena," but demanded in its Petition that Capitol produce all such sales data. *Id.* at 1-1 ¶ 13. In its Opposition to the Petition, Capitol informed the Court that "[s]ince the [Government] has finally indicated [in the Petition] that it wants the purchase orders for the entire date range – despite the burdens on Capitol Supply to produce documents the Government already has – Capitol Supply is more than willing to produce these documents. It will produce the documents in precisely the form that it receives them from the Government in PDF or .edi

format, which is how it produced them in July 2011." [D.E. 8 at p. 11]. The Court accepted Capitol's statements and granted the Petition, in part, on that basis. *See* [D.E. 16 at p. 17] (holding that Capitol's willingness to produce additional documents "alone warrants granting the Petition."). The Court also specifically ordered that "to the extent that CSI has retained information responsive to the subpoenas, it is required to produce that information in a format that is reasonably usable, which includes searchable, just as its databases are presumably designed to respond to search queries." [D.E. 16 at p. 21]

Capitol has produced all such existing documents containing sales data that it has been able to find in its files after a diligent search. This constitutes approximately 350,000 additional pages of documents in searchable PDF or .edi form. This new production includes not only documents reflecting individual sales of products, but also quarterly summaries of all Government sales data, which Capitol has maintained in its files over the last several years for audit purposes. Nevertheless, the Government mischaracterizes this Court's Order by arguing that this production of documents was improper. The Court did not, as the Government claims, bar Capitol from producing sales data in PDF form, nor did it "direct Respondent to avoid PDF documents." [D.E. 20 at p. 4]. Indeed, the Court specifically ordered Capitol to produce the sales data that it had in its possession. [D.E. 16 at p. 17]. That sale data happens to be maintained in PDF form, so Capitol cannot avoid producing it in that form. Contrary to the Government's representations to this Court, all of these documents are fully searchable.

Indeed, searchable PDF productions are entirely proper. The Sedona Conference, a nonprofit legal policy research and education organization encompassed of judges, attorneys, and electronic discovery experts and dedicated to resolving electronic document production issues, has concluded that searchable PDF documents, accompanied by a "load file" containing

searchable text and metadata, is in usable form and is electronically searchable and paired with essential metadata.[1] *See Aguilar v. Immigration and Customs Enforcement Div. of U.S. Dept. of Homeland Security*, 255 F.R.D. 350, 355-357 (S.D.N.Y. 2008) ("[T]he Conference concluded that even if native files are requested, it is sufficient to produce memoranda, emails, and electronic records in PDF or TIFF format accompanied by a load file containing searchable text and selected metadata. The Conference explained that this 'satisfies the goals of Principle 12 because the production is in usable form, e.g., electronically searchable and paired with essential metadata.'") (citations omitted); *see also Autotech Techs. Ltd. P'Ship,* 248 F.R.D. 556, 560 (N.D.Ill. 2008). Numerous courts have found that searchable PDFs are "reasonably usable" and sufficient. *See, e.g.*, *Aguilar*, 255 F.R.D. at 361. Indeed, in *Anderson Living Trust v. WPX Energy Production, LLC*, 298 F.R.D. 514 (D. New Mex. 2014), the Court held that production of 20,000 pages of documents in searchable PDF format was sufficient and that the requesting party, not the producing party, had the burden of "organiz[ing] it themselves – in their own way, to their own satisfactory level of thoroughness, and at their own expense – through the use of text-searching technologies like filtering, grouping, and ordering." *Id.* at 527. The Court expressly rejected the Government's argument here, holding that it would violate the Rules of Civil Procedure to require a party to "produce electronically stored information in more than one form." *Id.* (citing Fed. R. Civ. P. 34(b)(2)(E)(iii)). Capitol has produced its data in precisely this form, just as it is maintained in Capitol's files and just as the Court ordered.

The core of the Government's complaint is not that Capitol produced PDF documents as it was required to do, but that Capitol did not create new documents based on queries of

---

[1] *The Sedona Principles-Second Edition: Best Practices Recommendations and Principles for Addressing Electronic Document Production* Cmt. 12a (Sedona Conference Working Group Series 2007), http://www.thesedonaconference.org/content/miscFiles/TSC_PRINCP_2nd_ed_ 607.pdf ("*Sedona Principles 2d*").

Capitol's sales database. Although this is clearly beyond the scope of the subpoena in that it requires Capitol to create new documents, Capitol has attempted to meet the Government's needs by inviting the Government to Capitol's headquarters to engage in targeted queries of the database. *See* **Exhibit "2."** Specifically, Capitol invited the Government, subject to the entry of a protective order, "to inspect its sales database and COO data as those records and data are maintained in the ordinary course of business. . . . [T]his invitation is to review Capitol's sales database and COO data to inspect and copy such information as you need." *Id*. Capitol would work with the Government to craft queries that would extract the information that the Government has demanded. That information can be exported into new Excel spreadsheets that are easily readable by the Government. Nevertheless, the Government has declined this invitation, and it even failed to inform the Court within the Motion for Sanctions – filed 9 days *after* Capitol invited the Government to conduct a direct search and inspection of Capitol's sales data -- that Capitol had made this invitation to give the Government precisely what it claims to want. However, the Government's refusal to accept the information offered to it does not provide grounds to sanction Capitol. Capitol cannot be found to be in violation of the Court's Order to produce its sales records when it in good faith has offered the Government access to its entire sales database for purposes of inspection and copying.

**B. Production of Country of Origin Information**

The Government further moves for sanctions against Capitol for its alleged refusal to produce COO information for the products that it has sold to the Government. However, as Capitol has already informed the Government and this Court, it has already produced all existing documents relating to COO information. *See*, *e.g.*, D.E. 12-1 at p. 8 ("Capitol Supply has produced all available COO information that it has been able to discover after a diligent search.

And it has produced these documents in precisely the form that Capitol Supply received them and maintains them."). As this Court explicitly recognized in its Order, "[o]bviously . . . if the documents do not exist, their production cannot be compelled." [D.E. 16 at p. 8] (citing *Tech v. United States*, 284 F.R.D. 192, 198 (M.D. Pa. 2012) ("It is clear that the court cannot compel the production of things that do not exist. Nor can the court compel the creation of evidence by parties who attest that they do not possess the materials sought by an adversary in litigation.")).

It must be noted that the Government's position on records retention contradicts Capitol's dealings with the GSA for over the last decade, and is incorrect. No GSA auditor, nor any GSA contract officer, has ever told Capitol that it was expected to maintain COO data – data that relates to the specifics of a given product, as opposed to purchase orders and invoices relating to the sale of that product – historically for every transaction that Capitol ever made, for the retention periods referred to within the FAR. Indeed, Capitol has always maintained the records that it was told it needed to retain – sales data. In all three of the GSA's 2010, 2012, and 2014 audit of Capitol, the auditors stated that Capitol had (1) demonstrated compliance with the terms of its contracts; and (2) had demonstrated compliance with the Trade Agreement Act; and (3) was otherwise exceptional. *See* **Composite Exhibit "3."** In short, the records keeping requirement now being urged by the Government is inconsistent with the GSA's stance, over the course of many years, that Capitol was compliant with its contracts and the law by maintaining the records it did; and it is respectfully submitted that if the Government's position was consistent with the GSA's interpretation of the same record keeping requirements, the GSA's audits would not have concluded that Capitol was in compliance with its contracts. It may be that the Government's stance in this case is to the contrary of the GSA's ordinary practice. A search of national legal databases revealed not a single case interpreting the contract record

retention provisions in the manner in which the Government is urging upon this Court. Practically speaking, it is easy to see why – if the GSA expected Capitol to produce paperwork relating to daily sales for approximately 170 vendors, Capitol would be sitting on a landfill sized pile of paper, or own a server farm to rival Amazon.com.

The Government faults Capitol for failing to query its sales database for data that explicitly links COO information to individual product sales. Singular documents linking COO information to product sales do not exist, and therefore cannot be produced. *See Memorandum Opinion*, March 19, 2014 [D.E. 16], *citing Tech v. United States*, 284 F.R.D. 192, 198 (M.D. Pa. 2012). Capitol has also repeatedly notified the Government that it does not have daily COO data for products sold between 2004 and 2010, as that data was overwritten on a daily basis when new information was received from Capitol's vendors.[2] Even so, Capitol has offered to provide the Government with access to all of the information that Capitol has on COO data and sales data, and the Government can (and should) perform its own analysis of that data to output the work product the Government wants. Rather than accepting this offer or even informing the Court of this offer, the Government has instead moved for sanctions for failing to produce documents that it knows do not exist. Just as with its interpretation of the records retention requirements, the Government is overreaching here.

**C. Production of Protected Department of Defense Information**

As is more fully set forth within Capitol's Motion for Entry of Confidentiality Order and Modification of Minute Order of April 17, 2014 [D.E. 56, in related case 1:10-cv-01094 (BAH)],

[2] Capitol's computer back-up system is designed to guard against catastrophic data failures, and not necessarily to back-up daily data of all types for preservation *ad infinitum*. COO certifications are made at the time a product is placed on the contract, or a modification is made to the Contract. COO certifications are not made on a daily, per transaction basis, and because no contracting officer, nor any GSA auditor, ever claimed that such must occur, Capitol historically did not back up COO data on a daily basis. No GSA representative has ever faulted Capitol for failing to do so.

Capitol has offered to the Government to produce the passwords to the encrypted DOD information upon the entry of a Confidentiality Order. The Government has yet to provide Capitol with any commentary on the content of the proposed Confidentiality Order.

The DOD's EMALL Business Rules provide that:

> Orders from the DOD EMALL will be sent via Electronic Data Interchange (EDI), secure encrypted email, or other electronic format agreed to, based upon best practices.

DOD Business Rules and Agreement to Sell on DOD EMALL, § 1.14 (Mar. 13, 2012) (**Exhibit "4"**).[3]

The penalty for circumventing the DOD EMALL Business Rules are stark, swift, and harsh, as explained in Section 1.26 of the Rules: "IF IT IS DETERMINED THAT ANY SUPPLIER IS CIRCUMVENTING THESE RULES, THEIR CATALOG WILL BE TERMINATED IMMEDIATELY." (**Exhibit "4"**).

In order to comply with Section 1.14 of the DOD EMALL Business Rules, Capitol has obtained a security certificate through an authorized service provider approved by the DOD, such as Operational Research Consultants, Inc. ("ORC"). ORC provides private keys for use in accessing the DOD EMALL information. ORC's policies state, amongst other things, that:

- "[y]our private keys shall never appear outside of the module in which it was generated in plain text form."
- "No one shall have access to private signing key but the subscriber."
- "Operational copies shall be stored in an encrypted form and shall be protected by a password from unauthorized access. The subscriber (PKI Sponsor for Component) is responsible for ensuring that all copies of private keys, including those that might be embedded in component copies, are protected, including protecting any workstation on which any of its private keys reside."

[3] Additional EMALL restrictions that may bear on this issue include those set forth in § 1.13 of the DOD EMALL rules, including prohibitions that: "Do not … distribute any past, current, or future DOD EMALL customer lists to any third party."

- "Cryptographic modules that have been activated shall not be left unattended or otherwise active to unauthorized access."

*See* **Exhibit "5,"** ORC's Private Key Protection.

Distribution and use of an ORC security certificate by Capitol is subject to revocation if, amongst other things, "Certificate private key compromise is suspected," or "[t]he certificate holder can be shown to have violated the subscriber obligations …" or "[t]he certificate holder fails to make a payment or other contractual obligations related to the certificate." *See* **Exhibit "6,"** ORC's Certificate Practice Statement. There are many requirements governing the security of the DOD EMALL private keys. The consequence of violating those requirements can be immediate termination of Capitol's right to sell into the DOD EMALL. Such a termination would have an immediate and material adverse impact upon Capitol's business.

Capitol provided the proposed Confidentiality Order to the Government on July 10, 2014, but despite two (2) separate requests, at the time of this writing, the Government has neither provided comments on the proposed Confidentiality Order, nor said whether it was willing to agree to the proposed Confidentiality Order, instead stating that the request was being considered. The Government then sought to use the password issue to strategic advantage, and filed a Motion for Sanctions in the related Subpoena case without notifying the Court in the Motion for Sanctions about any of the foregoing – instead conclusorily referring to as unnecessary Capitol's request for a Confidentiality Order so that it could provide the Government with the security key passwords for the DOD EMALL data the Government has requested because "Capitol Supply does not sell national security equipment to DOD, nor is its sales of off-the-shelf office products a matter of national security." [D.E. 20, ¶ 12(d)]. Neither of the foregoing concerns have anything to do with DOD's terms and conditions for sale on the EMALL, and the AUSA's apparent disagreement with DOD's policies regarding confidentiality

and disclosure – and failure to disclose the existence of those policies to the Court -- do not alter the fact that those policies exist, and are binding. They cannot be blithely ignored, as the Government seems to have chosen to do in this case. The Government is attempting to manufacture a discovery issue for which it has no legitimate basis to complain. It is unfair for Capitol to be pilloried by the Government's counsel simply because Capitol is trying to comply with the DOD's policies.

### D. Production of Load Files

Finally, the Government complains that Capitol's production of a load file to assist the Government in its review of documents – which is standard in any production of documents – somehow constitutes "continued stalling and obstructive tactics." [D.E. 20 at p. 7]. The Government claims that Capitol produced an "Excel spreadsheet that contains unusable links to external documents that cannot be accessed by the United States." *Id*. However, the Government's complaint here is an example of its own insistence on sticking its head in the sand and refusing to accept the assistance offered by Capitol. It is by no means an example of a "stalling tactic" by Capitol or grounds for any sanctions.

When Capitol produced its documents to the Government, it provided them in a format such that the Government could load the documents into a review database of its choosing so that it could review and analyze the documents. *See* **Exhibit "7,"** Declaration of Michael Bhargava. As is standard practice in any such production, Capitol produced a "load file" to assist in this process of loading the files into its database. *Id*. The load files were in a comma-separated values (.csv) format that contained a line of metadata corresponding to each document in Capitol's production and a link to each of the documents in the production. *Id*. Because Capitol did not know which platform the Government intended to use for its review, Capitol produced

several different load formats for the Government's convenience. Again, this is standard practice in the production of documents in litigation. *Id.*

On June 19, 2014, counsel for the Government contacted counsel for Capitol by email indicating that "there is a link in the spreadsheet" in Capitol's production that the Government could not access, and it requested assistance with the file. *See* **Exhibit "8."** The Government did not provide the "spreadsheet" in question. The question was confusing to counsel for Capitol, since Capitol had not produced any spreadsheets as part of its production, but counsel for Capitol responded almost immediately by informing the Government that, according to its litigation support person who assembled the production, the Government was likely referring to "the actual load file for the volume" and that the links were "pointing to the images, text, or native[ files]." *Id.* Counsel informed the Government that "[t]his file needs to be imported into a review platform to work." *Id.*

Most critically, which the Government fails to mention to this Court, counsel for Capitol repeatedly offered to make its technical support person available to the Government if it needed assistance with the file, since neither of the attorneys engaging in the email exchange had relevant technical expertise. *Id.* In a June 19, 2014 email, counsel for Capitol told the Government, "Let me know if you need me to connect your tech person and ours." Rather than accepting this offer, counsel for the Government sent a follow-up email asking "which files need to be imported into a review platform and where those files are in the production." *Id.* Again, counsel for Capitol promptly responded[4] to the Government by trying to provide assistance and stating that "[i]f you have additional questions about the production itself, it's probably best to

[4] The Government misleadingly claims that "Capitol Supply failed to respond until thee (3) days later," but it fails to inform the Court that this email exchange occurred over a weekend. In reality, the Government asked its follow-up question on a Friday, and counsel for Capitol promptly responded the following business day (a Monday).

connect our IT folks directly. Please let me know if you want to do that." *Id*. Nevertheless, the Government refused to accept this assistance, and it failed to inform the Court that Capitol had offered this assistance.

Instead, the Government responded with an email on July 2 claiming that by producing a standard load file – which is done in any standard production to make it easier for the receiving party to load and review the documents – Capitol had "manipulated the production of information to make it unreadable and unusable by the GSA OIG, and then attempted to place the blame upon the GSA OIG for its inability to read the information you alleged was provided." *See* **Exhibit "9."** Ignoring the repeated offers that Capitol made to assist the Government in its confusion over this standard production, the Government bizarrely claimed that "[u]nfortunately, Capitol Supply does not want to make things easier for GSA OIG." Counsel for Capitol responded to the Government, stating that "[w]e have tried to resolve this issue with you by providing you with the contact information for our tech person here who handled the production, but you chose not to contact her. I do not know what spreadsheet(s) you are referring to, so please let us know, and we will try to resolve this issue." Again, rather than accept the assistance offered by Capitol, the Government instead chose to file its Motion for Sanctions, claiming that Capitol's efforts to assist the Government were only a "stalling tactic." However, the Government's refusal to accept assistance from Capitol does not constitute sanctionable behavior on Capitol's part.

## III. CONCLUSION

Once Capitol invited the Government to inspect and copy the records that the Government is disputing, the efficacy of the production and this controversy became moot – it is a claim that has lost its character as a live controversy – except that the Government has

strategically chosen to needlessly perpetuate the controversy instead of undertaking the inspection. The Court should deny the Government's Motion, because Capitol has in good faith attempted to comply with this Court's Order. Capitol remains willing to produce to the Government whatever else the Government may choose to inspect and copy from Capitol's sales and COO databases.

**RULE 26(C) CERTIFICATION**

I HEREBY CERTIFY that the movant has conferred with the other affected parties to resolve the dispute without court action.

Respectfully submitted,

PADULA HODKIN, PLLC
Co-Counsel for Capitol Supply, Inc.
101 Plaza Real South, Suite 207
Boca Raton, FL 33432
Phone: 561.544.8900
Fax: 561.544.8999

Date: July 25, 2014

By: /s/ Adam J. Hodkin
Adam J. Hodkin, FBN 962597
Email: ahodkin@padulahodkin.com

**VERIFICATION**

I HEREBY AFFIRM under penalty of perjury that the factual representations hereinabove are true and correct to the best of my knowledge and belief.

________________________________
ROBERT STEINMAN

STATE OF FLORIDA )
:
COUNTY OF BROWARD )

SWORN TO AND SUSCRIBED before me on this 25 day of July, 2014, by ROBERT STEINMAN, the CEO of CAPITOL SUPPLY, INC., who is personally known to me or who presented ________________________ as identification and who was/was not sworn.

Notary Stamp:

My Certificate Expires:

________________________________
NOTARY PUBLIC

THERESA CLARK
MY COMMISSION # EE 875825
EXPIRES: April 9, 2017
Bonded Thru Notary Public Underwriters

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was served by CM/ECF on this 25th day of July, 2014, on all counsel or parties of record on the Service List below.

/s/ Adam J. Hodkin
Adam Hodkin

## SERVICE LIST

**Darrell C. Valdez, Esquire**
Assistant United States Attorney
Judiciary Center Building
555 4th St., N.W., Civil Division
Washington, D.C. 20530
Counsel for United States of America

**Michael Bhargava, Esquire**
Chadbourne & Parke LLP
1200 New Hampshire Avenue, N.W.
Washington, DC 20036
Co-Counsel for Capitol Supply, Inc.